Filed 4/21/14  In re Carlos G. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re CARLOS G. et al.,<br><br>Persons Coming Under the Juvenile Court Law. | B251004<br>(Los Angeles County<br> Super. Ct. No. CK89252) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CARLOS G.,<br><br>    Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Anthony Trendacosta, Juvenile Court Referee.  Affirmed.

Christina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant.

Arezoo Pichvai for Plaintiff and Respondent.

## INTRODUCTION

Carlos G., Sr. (Father), appeals from a dependency court order terminating parental rights over his minor son Carlos G., Jr. (Carlos) and his minor daughter, K., following a Welfare and Institutions Code section 366.26[1] hearing. He contends that the juvenile court erred when it failed to apply the section 366.26, subdivision (c)(1)(B)(i) "benefit exception." Finding that substantial evidence supported the termination of parental rights, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Carlos and K. came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) when 10-month old K. was admitted to the hospital on July 31, 2011, after suffering a seizure. Medical tests showed that she had suffered a subdural hematoma and numerous retin al hemorrhages, and the examining physicians concluded that the only explanation for her injuries was that she had been forcefully shaken. The examining physicians estimated that the abuse causing the seizure likely was inflicted sometime within the 24 hours before the seizure.

DCFS investigated the case, but the perpetrator was never identified. Both parents denied all allegations of child abuse. Father's relatives reported that Mother, Brittany P., had anger management problems and frequently engaged in verbal and physical altercations with Father, who would attempt to avoid or leave these encounters. Mother frequently involved the children and exposed them to screaming and arguing, and on one occasion during a fight with Father, slammed three-year-old Carlos' head into a wall. Relatives reported seeing her hit Carlos

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

with an open hand on his head and face, and hearing slaps behind closed doors followed by screaming from the children. Father had a drinking problem and reportedly used alcohol and drugs to escape his relationship problems. He was arrested for drug possession in November 2010 and received summary probation, and also had arrests for driving under the influence on May 28, 2011 and again on July 29, 2011, two days before K. was admitted to the hospital.

Paternal relatives also alleged that both parents neglected the children, who were sometimes very dirty and often had full diapers long overdue to be changed. The parents' living conditions were often "terrible," even when they were living with relatives. The parents reportedly would leave the children in other relatives' care for days at a time while they "partied" at "raves."

*Section 300 Petition and Adjudication*

DCFS filed a petition pursuant to section 300, alleging that K. had suffered injuries consistent with being forcefully shaken and that would ordinarily not occur except as the result of deliberate and neglectful acts. The petition further alleged that Mother physically abused Carlos, that Father failed to protect him, that the parents had a history of violent altercations in the children's presence, and that Father was an abuser of alcohol. A first amended petition, as amended and sustained, further alleged that because Father was incarcerated for driving under the influence, he was unable to protect K. from Mother's deliberate and neglectful acts resulting in K.'s injuries. The children were detained and placed in foster care, eventually getting placed together in November 2011. Monitored visitation was ordered for Father "as often as possible," and at least three times a week. Father was ordered to participate in individual counseling, alcohol and drug counseling, and parenting classes, and to attend AA meetings.

3

*Six-Month Review Hearing*

As of the six-month review hearing held in August 2012, K. and Carlos were happy and comfortable in their foster home and had bonded with their foster parents. Father, who previously had been unemployed, had found full-time work.[2] He was participating in twice-weekly monitored visits with the children, often at a mall or a park, and he would bring them snacks and interact with them well in an appropriate and positive way. Father was also calling the children every night. He had completed parenting classes, and was continuing to attend individual counseling. He had dropped out of a substance abuse program in January, reportedly because of his job, and had failed to participate in random drug testing or AA meetings. In April, he re-enrolled in another substance abuse program that included random drug testing, and had had one test that was negative for drugs, but he was in danger of being terminated from his program for non-attendance.

Father's therapist from his individual counseling sessions reported that although Father initially did not understand the significance of participating in therapy, after one month he began to embrace the process and take responsibility for his past. Father had expressed a desire to reunify with his children and viewed his participation in therapy as a way to prepare himself for the role of a single parent.

Father was living in the paternal great-grandmother's home, which was not approved for overnight visits because it was where the abuse of K. was believed to have occurred and the perpetrator had not been identified. Father understood that he would have to find another place to live prior to regaining custody, but told the

---

[2] Because the minors' mother is not a party to this appeal, we do not recount the facts relating to her, except to state that her whereabouts became unknown during the dependency proceedings, and she failed to reunify with the children.

caseworker that he wanted to complete his substance abuse program before he began looking.

The court found Father in partial compliance with his case plan and continued reunification services.

*12-Month Review Hearing*

As of the date of the 12-month review hearing in October 2012, Father was still working full-time, and continued to reside in the paternal great-grandmother's home. He stated that he was hoping to move into an apartment with one of his aunts. When asked about his plans for childcare and transporting the children to therapy and school, Father stated that he hoped his aunt would handle that for him. He was continuing to visit the children twice a week, with the visits going very well, and he called them on a regular basis. However, the foster mother reported that when she asked Father to help with getting the children ready, he did not know how to brush their hair, get them dressed, or do other tasks that a parent should know how to do. It appeared to her that Father had never had to take care of the children before they were detained, because other relatives cared for them, while he and Mother were more like visitors. DCFS noted that Father had acknowledged that beginning when K. was a few months old, the paternal grandmother would take care of K. for several weeks at a time.

According to the foster mother, Father was bonded with Carlos, but not with K. Although he "went all out" for Carlos' birthday in March and had a huge party for him, he did not call K. on her second birthday in September. When the foster mother suggested having a party for K., and offered to share the cost, Father did not seem interested and claimed he did not have any money. Foster mother invited Father and his grandmother to a birthday celebration for K. anyway, and Father

5

attended but did not bring a gift for her and stayed only a short while before leaving to attend a county fair.

Father graduated from his substance abuse program in October 2012. He attended evening groups three times a week, and was attending individual sessions once a week. The program had not drug-tested him twice a month as requested by DCFS, and he tested a total of only nine times, each time with a negative test result. Father did not have an AA sponsor and did not have a plan for how he intended to participate in random drug testing.

Father's therapist indicated that while Father had been making progress in therapy, she believed he was not yet ready to take on the responsibility of parenting the children. She stated that he was immature and did not fully understand the amount of time and work that goes into parenting the children, and she felt he would not be able to handle taking the children to school and appointments every day and providing them with nutritious meals and clothing. For the past six months, she had been talking to Father about moving out of the paternal great-grandmother's home so that he could have a home suitable for the children to visit, but Father had not taken any concrete steps towards doing so.

The children continued to thrive in their foster home and were very bonded to their foster mother. Carlos was happy and healthy, and had been fully potty trained for approximately six months. K. was described as bright and happy, and also was potty-training. The foster parents were interested in adopting the children. Although the foster mother initially had indicated in April 2012 that she was unsure whether it was fair to the children to adopt them because of her increasing age (she was almost 70 years old), she no longer had reservations, having designated her adult daughter to assume care of the children should something happen to her or her husband.

The court found Father in partial compliance with his case plan. As a condition for regaining custody of the children, the court ordered Father to establish separate housing, have childcare in place, clear up issues with his car and driver's license, attend AA meetings with a sponsor on a regular basis, drug-test on a weekly basis, and attend the children's various medical appointments. The court ordered unmonitored visits for Father.

*Interim Review Hearing*

As of December 2012, Father had missed several drug tests, after last testing clean on November 15, 2012. He still did not have an AA sponsor and had not been attending meetings. He now had a breathalyzer machine in his car and had his driver's license reinstated. Father indicated that he was planning to move into an apartment around the corner from the paternal great-grandmother's home, where his aunt possibly could provide childcare. DCFS expressed concern that Father would be so close to the paternal great-grandmother's home and might leave the children at that home, where they potentially could be subject to abuse.

DCFS indicated concern regarding Father's "overt preferential treatment" of Carlos over K. The foster mother reported that Father came for a visit in November and brought two presents for Carlos and none for K. After the caseworker expressed concern to Father about showing preferential treatment to Carlos, at another visit Father again brought gifts for Carlos and not K.

*18-Month Review Hearing*

As of the 18-month review hearing in March 2013, Father had moved into a rental house with his aunt. The home was found to be appropriate, with two toddler beds for the children in Father's bedroom.

7

Father was no longer working and on March 2, 2013, had been arrested and jailed for an unknown offense. Although he had been attending individual therapy regularly, in December he attended only twice, and in January he attended only one appointment and did not respond when the therapist attempted to contact him regarding the missed appointments. He was terminated from therapy for non-attendance. Although he tested clean four times in November and December, he had missed three drug tests in November and did not participate in any drug testing after December 11. He claimed to have an AA sponsor and to have been attending meetings but did not provide signature sheets proving his attendance, as requested, and did not have his sponsor's phone number.

Father had been having unmonitored day visits with the children, but during the months of December and February he visited only once a week instead of twice a week, and failed to call to cancel the other weekly visit. He was supposed to go to a Breakfast with Santa event with the children but did not show up. Although he went to K.'s doctor's appointment in December, he did not attend Carlos'. On one occasion in January, he picked up the children for a visit at around noon, and when he brought them home that night at 8:00 p.m., it was very cold, but the children were still dressed in the same lightweight clothes they had been wearing earlier, even though the foster mother had packed warm clothes for them. In addition, K. was wearing the same diaper she had been wearing eight hours earlier. Father stated he had checked it but it never felt wet. When the foster mother removed it, she found it full of feces that had dried on K.'s skin, causing a severe diaper rash.

At the hearing, the court found Father to be in partial compliance with the case plan, terminated family reunification services, and set a section 366.26 hearing to identify a permanent plan for the children.

*Selection and Implementation Hearing and Termination of Parental Rights*

As of the date of the section 366.26 selection and implementation hearing held in August 2013, the children were continuing to thrive in their placement with their prospective adoptive parents and a homestudy had been completed and approved. The adoptive parents indicated that they were very attached to the children.

DCFS had changed Father's visits from unmonitored to monitored visits after his March 2013 arrest and his failure to drug test on a consistent basis, and in light of DCFS's concerns regarding Father's ability to care appropriately for the children on his own. Father continued to visit approximately one day a week, sometimes for four to five hours, with the children enjoying their time with him, but his visits were not always consistent. He failed to show up on Father's Day, even though he had called that morning and asked to visit. The children had made gifts for him and were upset when he did not come.

The court found by clear and convincing evidence that the minors were adoptable and terminated parental rights. The court found that the so-called "benefit" exception did not apply; although it appeared Father had maintained regular contact with the children, he had not satisfied his burden to show that the children would benefit from continuing the relationship. The court noted that the children had lived with the foster parents for approximately two years, which was most of K.'s life and half of Carlos' life. The foster parents had acted as their parents during that time, whereas Father had only done activities like take them to the park.

Father timely appeals from the order terminating parental rights.

## DISCUSSION

Section 366.26 requires the juvenile court to select and implement one of four possible permanent plans for a dependent child. The permanent plan preferred by the Legislature is adoption. (*In re Josue G.* (2003) 106 Cal.App.4th 725, 732.) If the child is likely to be adopted, the court must terminate parental rights and order the child placed for adoption unless it finds a compelling reason for determining that termination of parental rights would be detrimental to the child. (§ 366.26, subd. (c)(1)(B)). One such circumstance, the so-called "benefit exception" is set forth in section (i). The court is not required to terminate parental rights if it finds that "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."

Father argues that his parental rights should not have been terminated, because the section 366.26, subdivision (c)(1)(B) benefit exception applies. We review a juvenile court's ruling on whether the benefit exception applies for substantial evidence. (In *re Cliffton B.* (2000) 81 Cal.App.4th 415, 424-425.) "[W]e presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order. [Citations.]" (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.) Father bore the burden to show both that he maintained regular visitation and contact with the minors, and that they would benefit from continuing a relationship with him. (*In re Zeth S.* (2003) 31 Cal.4th 396, 412, fn. 9.)

The dependency court concluded that Father had regularly visited the children. We thus examine whether Father showed that the children would benefit from a continuing father-children relationship. We conclude that substantial evidence supports the dependency court's determination that Father did not make that showing.

10

"To overcome the preference for adoption and avoid termination of the natural parent's rights, the parent must show that severing the natural parent-child relationship would deprive the child of a *substantial*, positive emotional attachment such that the child would be *greatly* harmed." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.) "A child who has been adjudged a dependent of the juvenile court should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may be beneficial to some degree, but that does not meet the child's need for a parent." (*Ibid.*) "To overcome the strong policy in favor of terminating parental rights and to fall within [the purview of the benefit exception], the parent must show more than 'frequent and loving contact' [citation], and be more to the child than a mere 'friendly visitor or friendly nonparent relative.' [Citation.]" (*In re Helen W.* (2007) 150 Cal.App.4th 71, 81.) In determining the existence of a beneficial relationship, we look to "'[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs. . . .' [Citation.]" (*In re Jerome D.* (2000) 84 Cal.App.4th 1200, 1206.) The court must then balance the strength and quality of the parent-child relationship against the security and sense of belonging that a stable family would confer on a child. (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 811.)

Carlos and K. have spent more than two years of their short lives in the care of their foster parents, to whom they have bonded and in whose care they have thrived. Although Father's visits with the children have been positive, he is more akin to a "friendly visitor" than a father: he takes them for fun outings and plays with them, but has demonstrated that he may not always be counted on to change diapers, dress them in warm clothes when it gets cold, or take care of the many tasks a parent must perform on a daily basis. He also failed to show that he would ever be in a position to ensure that the children's needs were met, as he could never

11

articulate a concrete plan for the provision of childcare or for transportation to and from school as well as medical and therapy appointments. Father's failure to visit on Father's Day, after promising a visit, is indicative of the fact that he is not prepared to take on the role of a single father.

Further, although Father initially was participating in individual therapy and completed a substance abuse program, he dropped out of individual therapy, failed to demonstrate that he was attending AA meetings, and stopped drug testing. He was unable to show that he had achieved a stable and sober lifestyle such that keeping his status as the children's father would benefit the children. The record is clear that the children would benefit from the stability provided by a permanent placement, and that their interest in stability and permanent placement was not outweighed by any potential detriment from terminating Father's parental rights. The juvenile court did not err in terminating parental rights.

## DISPOSITION

The order terminating parental rights is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

WILLHITE, Acting P. J.

We concur:

MANELLA, J.                    EDMON, J.*

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

12